COMMONWEALTH vs. ROBERT E. SCHOEN
(and a companion case[1]).

Middlesex. June 5, 1987. — September 25, 1987.

Present: DREBEN, KASS, & FINE, JJ.

*Practice, Criminal*, Deliberation of jury, Interrogation of jurors, Newspaper article, Fair trial, Instructions to jury. *Evidence*, Relating to deliberation by jurors. *Jury and Jurors. Joint Enterprise.*

At the trial of indictments for aggravated rape, the judge did not err in denying the defendants' motion for a mistrial based on their allegation that extraneous influences had affected the jury's deliberations, where the judge first inquired whether the jurors had learned anything about the cases from an outside source and they responded that they had not, and where he then thoroughly interrogated them individually as to whether they could decide the cases solely on the evidence presented to them in the courtroom and each responded in the affirmative. [733-734]

At the trial of two defendants on indictments for aggravated rape, no substantial risk of a miscarriage of justice was created by the judge's unobjected-to instructions to the jury with respect to the intent required for a joint enterprise. [734-735]

INDICTMENTS found and returned in the Superior Court Department on October 30, 1984.

The cases were tried before *Ernest S. Hayeck*, J., sitting under statutory authority.

*Patricia A. O'Neill*, Committee for Public Counsel Services, for Robert E. Schoen.

*Lawrence R. Glynn* for Brian LaBonte.

*Emily J. Gould*, Assistant District Attorney, for the Commonwealth.

KASS, J. Both defendants were convicted of aggravated rape. Three hours into its deliberations, the jury asked the judge the following question: "If A, B, and C are involved in

---

[1] Commonwealth *vs.* Brian LaBonte.

a crime and if Mr. C pleads guilty to a lesser charge, can he be used as a witness by either the prosecution or the defense in the trial of A and B?" Counsel for the defendants at once moved for a mistrial. Denial of those motions forms the primary basis for this appeal.

There had been a third man among the assailants, whom the victim had mentioned. Indeed, his name began with the letter "C." He was not a defendant, nor had he been called as a witness. To that degree the jury's question was unsettling, the more so because on the second day of what dragged into a four-week trial, an article had appeared in the Lowell Sun saying that the third man, David Clegg, "pleaded guilty . . . to a reduced charge of indecent assault and battery" and "also pleaded guilty to unarmed robbery."

Immediately upon receiving the offending question from the jury, the trial judge forcefully instructed the jurors that their inquiry was out of bounds, that they were not to speculate about what had happened to the third man, "whether anything ha[d] happened to that person or not." He reminded the jurors that they were to decide the case solely on the evidence presented to them in court and to concern themselves only with the two defendants who had been tried before them, the jury.

The judge then probed for extraneous influences. He inquired whether the jurors had learned anything about the case from an outside source. All the jurors shook their heads. He urged the jurors to be candid. He assured them that "[t]here's no sin, no crime, nothing heinous about knowing something if you just let us know." The judge then asked each juror individually whether he or she knew "anything in the way of information or background that would give rise to [the] question, other than what you've heard in this trial, in this case, in this courtroom, and nowhere else?" Each of the jurors answered in the negative. After again exhorting the jury that "C has nothing to do with it," he polled each of the jurors with the question: "Are you absolutely certain that you can limit yourself to a consideration of the evidence in this case without letting any speculation relative to anybody else that you've referred to as Mr. C here be involved? Are you certain of that, all of you?" Each juror individually answered that question in the affirmative.

When the newspaper article about Clegg had appeared, the judge on the following morning had inquired of the jurors whether any of them had read the article or had heard anything about the case on radio or television. No juror responded in the affirmative.

In dealing with the defense claim of extraneous influence upon the jury, the judge adhered to the guidelines set out in *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978), and *United States* v. *Perrotta*, 553 F.2d 247, 249-250 (1st Cir. 1977). The defense pressed on the judge that the Lowell Sun article must have been the source of the jury's irrelevant musings. The prescription in *Perrotta* for dealing with such a possibility was as follows:

"[T]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he had read or heard any of the publicity in question, the judge is not required to proceed further." See also *Margoles* v. *United States*, 407 F.2d 727, 735 (7th Cir.), cert. denied, 396 U.S. 833 (1969); *United States* v. *Trapnell*, 638 F.2d 1016, 1022 (7th Cir. 1980).

Here the jurors throughout the case consistently denied contact of any kind with comment or material about the case other than that to which they had been exposed in the courtroom. Contrast *Commonwealth* v. *Dixon*, 395 Mass. 149, 150 (1985), in which a juror called the defense lawyer to report that another juror had been exposed to extrajudicial conversations about the case.

In view of the judge's thorough interrogation of the jury and the response of the jurors, the defendants are obliged to argue that the jurors' responses were incredible and that the judge erred in crediting them. Yet, it would have been more remarkable for the judge to conclude that each of the jurors (counting alternates, there were sixteen) was persistently lying. At all events, the judge was in the best position to judge the credibility

of the jurors. *Commonwealth* v. *Ciminera*, 11 Mass. App. Ct. 101, 109 (1981). See also *Commonwealth* v. *Amirault*, 399 Mass. 617, 626 (1987). Once the existence of extraneous influences upon the jury was eliminated, speculation about what the jurors thought and why was improper. See *Commonwealth* v. *Fidler*, 377 Mass. 192, 198-199 (1979); *Commonwealth* v. *Scanlan*, 9 Mass. App. Ct. 173, 183 (1980); Greaney, Juror Impeachment and Post-Verdict Interrogation of Jurors, 64 Mass.L.Rev. 85 (1979).

That the jury were curious about the third man is not astonishing. The defendants and the victim had placed him at the scene of the assault. The victim testified that Schoen and LaBonte had held her and raped her, but that Clegg had only kissed her and touched her. The jurors did not need to be unimaginably sophisticated to surmise that the absence of Clegg from the trial implied a plea to a lesser offense. The jurors had no business drawing inferences about an irrelevant issue, but the judge gave firm corrective instructions on that score. We are to presume that the jury followed those instructions. *Commonwealth* v. *Fidler*, 377 Mass. at 198-199.

The judge did not err in denying the defendants' motion for a mistrial.

Each defendant also argues on appeal that the judge incorrectly instructed the jury on the intent required for joint enterprise. On the basis of the instruction given, they argue, the jury could have found either defendant guilty of aggravated rape even if only one of them, or neither of them, had raped the victim. No objection to that aspect of the charge was made at trial and our review is on the substantial risk of a miscarriage of justice standard. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). *Commonwealth* v. *Pickles*, 393 Mass. 775, 776 (1985). Reading the charge in its entirety, we think it was sound. See *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980).

The issue of joint enterprise came up only as an element of aggravated rape. No attempt was made at trial to argue that either defendant was being charged with rape on the basis of joint enterprise. The judge defined aggravated rape, tracking

with slight variation language from G. L. c. 265, § 22(*a*), as follows:

> "Whoever has sexual intercourse or unnatural sexual intercourse with a person and compels such person to submit by force and against his or her will or compels such person to submit by threat of bodily injury and if either such sexual intercourse or unnatural sexual intercourse results in or is committed with acts resulting in serious bodily injury or is committed by a joint enterprise or is committed during the commission or attempted commission of a certain crime . . . shall be punished."

Based on the above definition (as well as under additional instructions given by the judge), the jury had to find each defendant guilty of rape and, in addition, find aggravating circumstances. In defining joint enterprise, the judge included that "what must be proved is that the defendant in some way *associated* himself with the venture, that he *participated* in it as something *he wished to bring about*; that he was, in other words, an active participant as distinguished from having merely been present or at the scene when some other person committed a criminal act" (emphases supplied). The concept of intent may be conveyed to the jury in a variety of ways. *Commonwealth* v. *Dyer*, 389 Mass. 677, 683 (1983). The judge correctly communicated to the jury the required mental state.

*Judgment affirmed.*