COMMONWEALTH *vs.* JOHN W. BRESNAHAN.

Nantucket. March 5, 2012. - July 13, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Jury and Jurors. Judge. Evidence,* Relating to deliberation by jurors. *Practice, Criminal,* Deliberation of jury, New trial.

This court concluded that in the circumstances of a motion for postverdict juror inquiry in a criminal matter in which there is a credible claim that the jury may have been exposed to an extraneous matter or influence, but there is also a claim of unauthorized postverdict contact with jurors that suggests wrongdoing by the defendant, the judge must conduct a meaningful inquiry (including, if necessary, an evidentiary hearing) into the alleged juror contact and weigh both claims in deciding whether to grant the motion. [769-773]

A District Court judge erred in allowing a criminal defendant's motion for a new trial on the basis that the jury had been exposed to an extraneous influence during deliberations and the Commonwealth had failed to establish the absence of prejudice, where the judge declined to permit the Commonwealth a meaningful opportunity to inquire into the defendant's allegedly unauthorized postverdict contact with jurors [773-775]; however, the judge's finding of extraneous influence was not clearly erroneous as a factual matter [775-777].

COMPLAINT received and sworn to in the Nantucket Division of the District Court Department on November 8, 2005.

The case was tried before *Joseph I. Macy,* J., and following a stay of appeal to allow for postverdict jury inquiry, a motion for a new trial, filed on July 17, 2008, was heard by *Robert V. Greco,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Russell W. Fuller* for the defendant.

*Thomas G. Shack, III,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. More than a year after his conviction for operating a motor vehicle while under the influence of alcohol, the

defendant, John W. Bresnahan, moved for postverdict inquiry of the jurors. The trial judge had recused himself, and a different judge granted the defendant's motion for postverdict inquiry. After holding evidentiary hearings, the judge allowed the defendant's motion for a new trial on the basis that the jury had been exposed to an extraneous influence during deliberations and the Commonwealth had failed to prove that the incident did not prejudice the defendant. The Appeals Court vacated the order for a new trial and remanded the case for further inquiry into the bases for the defendant's request for a postverdict inquiry of the jurors and, in particular, the role played by the defendant and his friend in contacting a juror, in apparent violation of the principles announced by this court in *Commonwealth* v. *Fidler*, 377 Mass. 192 (1979) (*Fidler*). See *Commonwealth* v. *Bresnahan*, 79 Mass. App. Ct. 353, 364 (2011). We granted the defendant's application for further appellate review. We agree that remand for further inquiry is appropriate, but take this opportunity to clarify the procedure for conducting postverdict hearings where, although a defendant claims that the jury were exposed to an extraneous influence, there is also evidence that the defendant or someone acting on the defendant's behalf may have violated the *Fidler* principles.

1. *Background.*[1] a. *Trial.* On December 5, 2006, the defendant was tried in the District Court on a charge of operating a motor vehicle while under the influence of alcohol. The Commonwealth presented the testimony of two police officers. The first officer testified as follows. On November 7, 2005, at approximately 9 P.M., the officer was driving in the opposite direction from the defendant on a narrow street in Nantucket. The defendant was driving on the wrong side of the street, but after a moment "jerked" his car back to the correct lane. After stopping the defendant, the officer smelled a strong odor of alcohol on the defendant's breath and observed an open beer can on the driver's side floor and two empty beer cans on the front pas-

---

[1] The facts are taken from the judge's findings and rulings on the defendant's motion for a new trial; his findings and rulings on the Commonwealth's motion for reconsideration; the February 19, 2008, affidavit of the defendant's first appellate counsel; and the transcripts of the evidentiary hearings held on June 25 and November 20, 2008. The transcript of a third evidentiary hearing, held on December 16, 2008, is unavailable.

senger seat. Although the defendant stated that he had had only one beer that night, he was unsteady on his feet and failed multiple field sobriety tests.[2] The second officer, who was called to the scene for backup and to watch traffic, testified that he saw the defendant sway from side to side and smelled a strong odor of alcohol on his breath. Both officers opined that the defendant was drunk.

The defendant testified that at the time of the incident, he suffered from late-stage Lyme disease, causing his joints to be sore and affecting his walking and bending, and from shingles, which caused severe pain in his back, shoulder, groin, and thighs. He submitted progress notes from his doctor to confirm that he had been treated for these conditions in 2004 and 2005. The defendant testified that not only was it physically difficult for him to complete the sobriety tests due to his medical conditions, but he was distracted by the lights of passing traffic and "bewildered" by the situation.

The jury began deliberating at 4:20 P.M. At 5:20 P.M., according to the trial judge's notes, the jury sought an answer to a question; however, neither the trial transcript nor any other part of the record indicates what the jury's question was or that they were brought back into the court room for an answer. Thirty-five minutes later, at 5:55 P.M., the jury returned a verdict of guilty. The judge sentenced the defendant to two and one-half years in a house of correction.

b. *Motion for postverdict juror inquiry.* One year after the trial, the defendant's friend and former landlord, Barbara Constantine, contacted the defendant's appellate counsel, by telephone. According to counsel's affidavit submitted by the defendant in support of his motion for postverdict juror inquiry, Constantine contacted appellate counsel to tell him that a juror who served on the defendant's trial (Juror A) had told Constantine that she, the juror, "was upset about the way that deliberations in the case had gone and wanted to talk to someone about it." One week later, Constantine telephoned appellate counsel again to tell him that Juror A had provided a telephone number so that appellate counsel could contact her. He thereafter spoke

---

[2]There is no evidence in the record that the defendant was asked to take a breath test for blood alcohol content.

with Juror A on the telephone twice. During the second conversation,[3] Juror A stated that the trial judge had entered the jury room during deliberations and told the jurors, "I understand that you are having trouble reaching a verdict"; "You are not leaving here until you have reached a verdict"; and that the jury should "go with the group consensus."

Appellate counsel moved to withdraw from the case, and the defendant's present counsel became successor appellate counsel. The defendant filed a motion for postverdict juror inquiry, supported, as previously noted, by appellate counsel's affidavit. No affidavit from either Constantine or Juror A was filed or offered. The trial judge recused himself from the case, and a different District Court judge denied the motion for lack of credible evidence because Juror A did not appear personally or submit her own affidavit. The defendant then filed a motion for reconsideration, supported by an additional affidavit from appellate counsel explaining that counsel had not solicited an affidavit from Juror A because he did not want to communicate with the juror again without the judge's permission. This second judge vacated his previous order denying the motion and recused himself from further proceedings. A third District Court judge (motion judge) then was assigned to hear the matter.

After a hearing on June 10, 2008, the motion judge allowed the defendant's motion for postverdict juror inquiry. On the basis of what Juror A told the defendant's appellate counsel, as set out in counsel's affidavit, the motion judge found the defendant had presented a "colorable claim" that there had been an improper, extraneous influence on the jurors during deliberations in the form of an ex parte communication between the trial judge and the jurors.

c. *First evidentiary hearing.* The motion judge held an evidentiary hearing on June 25, 2008, at the District Court in Nantucket. Four of the six jurors who had deliberated on the defendant's case testified. Juror A testified to the following. The trial judge entered the jury room twice during the jury's deliberations. The first time, the judge explained the procedure to be followed if the jury had any questions. On this first occa-

---

[3]The first conversation was cut short by Juror A's schedule.

sion, a court officer opened the door for the judge, but Juror A could not remember if the court officer also came into the jury room. The second time, near the end of deliberations, the judge responded to the jury's question about what to do if they could not agree on a verdict. The trial judge told the jury, "You have to agree . . . . [L]isten to the judgment of your peers and agree." Juror A also thought that the judge said something to the effect of, "[Y]ou are not leaving here until you have reached a verdict." This time, the judge was "escorted in" by a court officer, but Juror A did not believe that the court officer remained in the room. The judge never indicated which way — guilty or not guilty — the jury should decide the case.

Juror A further testified that she spoke with Constantine three times, and Constantine had initiated all the conversations. The first time Constantine telephoned Juror A, probably in the spring of 2007, she asked Juror A why the jury took so long to reach their verdict, and Juror A replied, "I'm not sure I'm supposed to answer that." Nonetheless, Constantine telephoned Juror A again, some months later, and Juror A responded to Constantine that she had nothing new to report. More recently — four or five months before the June 25, 2008, hearing — Constantine telephoned Juror A a third time and told her, "Well, you read in the paper all the time about what jurors have said about various famous trials," and that it would be "legal" for Juror A to speak with her about the deliberations. During this conversation, Juror A decided to tell Constantine what the jury had discussed concerning the evidence in the case. Juror A also recalled that she "probably" talked to Constantine about the trial judge, and that she "probably" told Constantine the same account to which she had just testified.

A second juror (Juror B) testified that the trial judge never entered the jury room and never told the jurors that they had to reach a verdict. A third juror (Juror C) testified that the trial judge entered the jury room shortly after the jury had begun to deliberate to explain the process. She did not remember whether the judge was accompanied by anyone. According to Juror C, another juror asked what would happen if they were unable to reach a verdict by the end of the day, and the trial judge replied, "Well, we'd want you to stay until you made a decision." He

did not say that jurors should "go with the consensus" if the jury were unable to reach a verdict. Juror C also testified that the jury never indicated they were having difficulty deciding on a verdict.

A fourth juror (Juror D) testified that the trial judge had entered the jury room, but she was not sure if one of the court officers also had entered. Juror D remembered two conversations with the judge. In the first, which occurred about fifteen to thirty minutes after the jury had been deliberating, one of the jurors asked what would happen if they did not reach a decision, and the trial judge answered that the jury should come to a conclusion. The jury reached their verdict approximately fifteen to thirty minutes later. The second conversation occurred when the judge asked the jury to wait after they had returned to the court room and delivered the verdict. He then returned to the jury room and thanked the jurors for their time.

After the June 25 hearing, at the motion judge's invitation, the trial judge submitted a written report of his memories of the trial. In it, the trial judge wrote that he was informed the jury had a question at 5:20 P.M., but then was told shortly thereafter that the jury had resolved the question on their own. He also stated that he never entered the jury room while the jury were deliberating, although, as was his custom, he did speak to the jurors in the jury room after he had taken the verdict in the court room and before he had sentenced the defendant. While he was speaking to the jurors after they had reached their verdict, one of the jurors asked what would have happened if the jury had not been able to reach a verdict, and the judge responded by paraphrasing the *Tuey-Rodriquez* charge.[4]

d. *Ruling on motion for a new trial.* Following the June 25 evidentiary hearing, the defendant filed a motion for a new trial on July 17, 2008. On August 7, the motion judge issued his decision on the motion, in which he found as follows. After beginning deliberations, the jury indicated that they were seeking information from the trial judge. In response, the trial judge

---

[4]The *Tuey-Rodriquez* charge is an instruction designed to encourage the jury to reach a verdict, if possible. See *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 98-101, 101-102 (1973) (Appendix); *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-4 (1851).

entered the jury room without the knowledge of the prosecutor or defense counsel. While there, the judge did not tell the jurors that they must agree on a verdict or that they could not leave until a verdict was reached.[5] However, the trial judge did tell the jury that they were to come to a decision, "without any qualifying language concerning what would happen if they did not or what they should do if an impasse was reached."

The motion judge found that the defendant had proved by a preponderance of the evidence that the jury were exposed to an "extraneous matter," meaning the trial judge's ex parte remarks to them during deliberations. The motion judge accordingly determined that the burden shifted to the Commonwealth to prove beyond a reasonable doubt that the defendant was not prejudiced by the extraneous matter. See *Fidler*, 377 Mass. at 201. He concluded that the Commonwealth had failed to prove the absence of prejudice because "[t]he jurors were clearly given the impression that their options were to find the defendant guilty or find him not guilty . . . [and] that advising the court that they were deadlocked was not an option." He also found that the Commonwealth's evidence against the defendant, while substantial, was not overwhelming, and that the jury might not have convicted the defendant if not for the misleading ex parte instructions. Because the Commonwealth failed to prove the absence of prejudice beyond a reasonable doubt, the motion judge allowed the defendant's motion for a new trial.

*e. Second and third evidentiary hearings.* In response to a motion for reconsideration filed by the Commonwealth, the motion judge held a second evidentiary hearing on November 20, 2008, during which he heard the testimony of a fifth juror, the trial judge, the defendant, the trial prosecutor, and three court officers. The fifth juror (Juror E) testified that the jury had a question and that they received an answer outside the court room that was not in writing. The juror recalled that either the

[5]Although the motion judge generally credited the testimony of the juror (Juror A) contacted by Barbara Constantine, he made a specific finding that he did not credit her testimony about the precise words spoken by the judge in the jury room. The judge stated: "[I]n this regard[, Juror A's] account was inconsistent with the three other jurors who testified. Also, her contact with, and lobbying by, [] Constantine created a bias that the other jurors did not have."

trial judge gave the answer or the jury were told that they already had been given an answer. Juror E further stated that he did not recall that the trial judge had helped the jury resolve any issue about the meaning of "reasonable doubt." The motion judge inferred from this somewhat vague testimony that the jury likely received the answer to their question in the jury room, because they did not get an answer in writing or in the court room; the motion judge therefore found Juror E's testimony supportive of the testimony of Jurors A, C, and D that the judge had indeed provided ex parte instructions to the jury in the jury room.

The trial judge testified consistently with his prior written report. The trial prosecutor and the court officers testified that they never saw the trial judge enter the jury room.

On December 16, 2008, a third and final evidentiary hearing was held at which the chief court officer testified.[6] He stated that he was in the lobby with the trial judge for the entire time the jury were deliberating, and the trial judge never left. He further testified that during deliberations, a female court officer knocked on the door of the lobby and told the trial judge that the jury had a question. The trial judge asked the officer to have the question put in writing and called the attorneys into his lobby, where they waited for thirty to forty-five minutes. When the court officer returned, she stated that the jury had reached a verdict.

f. *Ruling on motion for reconsideration.* After hearing the testimony at the second and third hearings, the motion judge continued to credit the accounts of the jurors who had testified at the original evidentiary hearing to the effect that the judge had delivered ex parte remarks during deliberations. The motion judge "in large part . . . reject[ed] evidence to the contrary presented at the November and December hearings." Therefore, he let stand his previous order granting a new trial.

g. *Appeal.* In its decision on the Commonwealth's appeal from the motion judge's order, the Appeals Court concluded that the judge erred by "engag[ing] in a postverdict examination of jurors prematurely and without affording the Commonwealth the opportunity to explore whether the defendant's

---

[6]According to the Commonwealth, the transcript of this hearing is unavailable.

claim of an extraneous jury influence was orchestrated by a surrogate acting on behalf of the defendant." *Commonwealth* v. *Bresnahan*, 79 Mass. App. Ct. at 353. The court suggested that proof of such orchestration by the defendant through his friend Constantine might have led the motion judge in the first instance to decline any postverdict inquiry of the jurors, and in any event was likely to have "colored the judge's over-all credibility assessments and factual determinations." *Id.* at 364. The Appeals Court therefore vacated the order granting the defendant's motion for a new trial and remanded the case to a different District Court judge for additional inquiry into "the basis underlying the defendant's showing in support of his request for posttrial contact of the jurors, including, without limitation, examination of Barbara Constantine." *Id.* For reasons somewhat different from the Appeals Court, we vacate the order granting the defendant's motion for a new trial and remand the case to the same motion judge for additional inquiry of Constantine and the defendant.

2. *Discussion.* a. *Claim of* Fidler *violation by or on behalf of the defendant.* This case implicates several significant interests: on the one hand, a defendant's right to trial by an impartial jury, guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights; and on the other, the finality of jury verdicts and protection of jurors from unwelcome solicitation or harassment by litigants following their jury service. See *Fidler*, 377 Mass. at 196-197; *Woodward* v. *Leavitt*, 107 Mass. 453, 460-461 (1871). See also Diehm, Impeachment of Jury Verdicts: *Tanner* v. *United States* and Beyond, 65 St. John's L. Rev. 389, 394-406 (1991); Carlson & Sumberg, Attacking Jury Verdicts: Paradigms for Rule Revision, 1977 Ariz. St. L.J. 247, 250-251 (Carlson & Sumberg).

This court attempted to balance these concerns in *Fidler, supra* at 204, by prohibiting counsel, litigants, and those acting for them from any postverdict contact with jurors absent permission from a judge.[7] The *Fidler* proscriptions in relevant part have been adopted as a rule of professional conduct. See Mass.

---

[7] In *Commonwealth* v. *Fidler*, 377 Mass. 192, 192-193 (1979) (*Fidler*), the defendant moved for a new trial, supported by an affidavit from a juror alleging

R. Prof. C. 3.5 (d), 426 Mass. 1391 (1998) (rule 3.5 [d]). The rule bars attorneys from initiating contact with jurors after a verdict is rendered without court approval, although attorneys may respond to juror-initiated communications so long as such response is not intended to harass, embarrass, or influence future jury service.[8]

Against this backdrop, the Commonwealth claims that the motion judge abused his discretion by refusing to investigate the circumstances underlying Constantine's and appellate counsel's conversations with Juror A before granting the defendant's motion for postverdict juror inquiry at an evidentiary hearing. It theorizes that if Constantine acted on the defendant's behalf in contacting Juror A, any information obtained through that contact cannot be used to impeach the jury's verdict.[9] In essence, the Commonwealth seeks to institute an exclusionary

that the jurors considered testimony that the judge had instructed them to disregard and were exposed to information not admitted or discussed at trial. There was a finding that one of the jurors said to the others that "people who run around with guns like [the defendant]" might get shot, and another juror responded that someone had shot the defendant during the previous month in Charlestown. *Id.* at 194. The trial judge denied the defendant's motion for a new trial without inquiring of the jurors. *Id.* at 194-195. This court held that the jurors' consideration of testimony they were instructed to disregard and the comment about "people run[ning] around with guns" were not proper subjects of postverdict inquiry, because they were part of the jury's internal decision-making process rather than an extraneous influence. *Id.* at 198-199. However, the court also held that the judge should have granted postverdict inquiry as to the comment about the defendant's being shot at in Charlestown, because that information had come from outside the trial. *Id.* at 199-200. The court deemed appropriate the following procedure to investigate allegations of extraneous influence: "[C]ounsel, litigants, and those acting for them may not independently contact jurors after a verdict is rendered. Counsel may investigate unsolicited information only to see if it is a matter worth bringing to the judge's attention." *Id.* at 204.

[8]Rule 3.5 (d) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1391 (1998) (rule 3.5 [d]), states: "A lawyer shall not . . . after discharge of the jury from further considération of a case with which the lawyer was connected, initiate any communication with a member of the jury without leave of court granted for good cause shown. If a juror initiates a communication with such a lawyer, directly or indirectly, the lawyer may respond provided that the lawyer shall not ask questions of or make comments to a member of that jury that are intended only to harass or embarrass the juror or to influence his or her actions in future jury service. In no circumstances shall such a lawyer inquire of a juror concerning the jury's deliberation processes."

[9]The Commonwealth argues also that the defendant's then appellate counsel

rule that would prevent a judge from hearing or at least consider-ing evidence about an alleged extraneous influence on a jury if the initial information was gained through improper juror contact. The claim for such a rule is premised on the Commonwealth's reading of the following sentence in *Fidler*: "Any counsel or litigant who independently contacts jurors 'acts at his peril, lest he be held as acting in obstruction of the administration of justice . . . .' " *Fidler*, 377 Mass. at 204, quoting *Rakes* v. *United States*, 169 F.2d 739, 745-746 (4th Cir.), cert. denied, 335 U.S. 826 (1948).[10] We disagree: there is nothing in the quoted sentence or in *Fidler* generally to indicate that evidence obtained in violation of the *Fidler* principles is automatically subject to an exclusionary rule. See *Commonwealth* v. *Solis*, 407 Mass. 398, 401-402 (1990) (rejecting imposition of exclu-sionary rule where defendant's counsel solicited information from jurors after trial while waiting near public elevators in court house, in violation of *Fidler* principles, but defendant himself was not involved).

In any event, we find no justification for adoption of a strict exclusionary rule whenever a violation of the *Fidler* principles is found to have occurred. Where a defendant's Sixth Amend-ment and art. 12 right to a fair trial is at stake, a court cannot ignore credible evidence that a trial judge entered the jury room during deliberations. Cf. *Parker* v. *Gladden*, 385 U.S. 363, 363-365 (1966) (per curiam) (granting defendant new trial because of bailiff's statements to deliberating jurors regarding defend-ant's guilt); *id.* at 366-367 (Harlan, J., dissenting) (describing defendant's extensive solicitation of jurors for evidence to sup-port new trial motion). See Carlson & Sumberg, *supra* at

should have sought permission from the judge before contacting Juror A. We agree that this would have been the better course because counsel was not contacted directly by Juror A.

[10]The Appeals Court, while purporting not to reach the question whether "the improper contact and importuning of a juror in violation of *Fidler* by the defendant himself might call for imposition of an exclusionary rule," *Com-monwealth* v. *Bresnahan*, 79 Mass. App. Ct. 353, 363-364 (2011), nonetheless suggested that *Fidler* itself created a quasi exclusionary rule: "[I]mplicit in *Fidler* and its progeny is the requirement that the defendant's showing [of an extraneous influence on the jury] may not *itself* be the tainted product of improper postverdict interrogation by the defendant or his agent" (emphasis in original). *Commonwealth* v. *Bresnahan, supra* at 361.

269 ("While courts may choose to ignore reports of jury misconduct in other situations, this posture is unacceptable in criminal cases. Where the misconduct deprives a defendant of his [S]ixth [A]mendment rights, courts must consider the misconduct . . .").[11]

Our refusal to adopt a strict exclusionary rule, however, does not mean that Constantine's conduct was proper or, more particularly, that the motion judge should have declined to investigate the Commonwealth's claim that Constantine may have initiated contact with one or more jurors.[12] As suggested in *Commonwealth* v. *Solis*, 407 Mass. at 401-402, where there is a credible claim[13] that the jury may have been exposed to an extraneous matter or influence, but there is *also* a claim of a *Fidler* violation that suggests wrongdoing by the defendant, the judge must conduct a meaningful inquiry into the alleged *Fidler* violation and weigh both claims in deciding whether the defend-

---

[11]As we discuss immediately below in the text, a judge confronted with credible information indicating a possible *Fidler* violation must take steps to evaluate it further before conducting an inquiry of the jurors. But it is important to recognize that there are remedies other than an exclusionary rule for improper communications with jurors after the entry of a verdict. An attorney who initiates contact with a juror may violate rule 3.5 (d) and may be referred to the Board of Bar Overseers for disciplinary action. A litigant, or anyone acting on a litigant's behalf, may be subject to criminal prosecution under G. L. c. 268, § 13B, for wilfully threatening, bribing, misleading, intimidating, or harassing a juror. Trial judges also have the discretionary authority to issue orders to litigants not to contact jurors after the conclusion of trial; any violation of such a court order would be the basis for a finding of contempt.

[12]At the time that the judge ruled on the defendant's motion for juror inquiry, there was no evidence before him that Constantine had initiated the conversations with Juror A. All the judge knew, as related by counsel's affidavit, was that Constantine had contacted counsel and told him that Juror A wished to speak with him. At the hearing, the assistant district attorney asked for "an affidavit from [] Constantine as to exactly how the conversation [with Juror A] came about[,] who contacted her, [and] whether she contacted the juror in the case." The judge declined to request such an affidavit, stating that inquiry of Constantine was relevant to determinations of credibility (presumably, of the jurors) and could be addressed later in the proceedings. Only during Juror A's testimony at the first evidentiary hearing did it come to light that Constantine had telephoned Juror A three times in spite of the juror's initial reluctance to speak with Constantine.

[13]Of course, if a judge does not find credible the allegations of extraneous influence, he or she may deny the defendant's motions for juror inquiry and for a new trial without conducting further hearings.

ant's motion for juror inquiry should be granted. A meaningful inquiry may well require an evidentiary hearing in order to evaluate whether a *Fidler* violation occurred and, if so, its nature and extent.[14] Where such an inquiry leads the judge to conclude that the *Fidler* principles in fact were violated by the defendant or someone acting on the defendant's behalf, the next step is to balance the *Fidler* violation or violations against the information that has been presented about the extraneous matter or influence — accepting, for purposes of the balancing exercise, that such information is accurate. Based on the evidence received, if the judge continues to believe that there is a colorable showing of extraneous influence on the jury, and also finds a violation of *Fidler* by the defendant or on his behalf, the judge must balance these considerations in deciding whether to grant the defendant's motion for juror inquiry. The balance ultimately struck will be highly dependent on the factual circumstances.[15]

The motion judge did not follow such a course in this case.[16] Rather, after deciding that the defendant had raised a colorable claim of extraneous influence, the judge followed the two-step

---

[14]In this case, at the very least, the motion judge should have allowed the Commonwealth's request that the defendant obtain an affidavit from Constantine before ruling on the defendant's motion for juror inquiry; it would have been helpful, as well, to determine whether counsel was in possession of additional information about how the contacts between Constantine and Juror A had originated. The judge also would have been warranted in requiring one or more of the relevant individuals — Constantine, Juror A, and the defendant — to testify at a preliminary hearing.

[15]For example, if, in a particular case, a judge were to find that the defendant had committed a significant violation of the *Fidler* principles by using some form of harassment, threats, or coercion of a juror, and the alleged extraneous influence, if true, appeared to be relatively minor, the defendant would likely not be entitled to a postverdict juror inquiry on the issue of extraneous influence. On the other hand, if the facts found by the judge were that the *Fidler* violation was relatively minor — e.g., a defendant's relative encountering a juror from the defendant's trial in the course of daily life, asking a general question about the trial, and in response the juror volunteering that a court official had entered the jury room during deliberations and urged the jurors to find the defendant guilty — allowance of the defendant's motion for postverdict juror inquiry likely would be warranted.

[16]Existing case law has given little guidance on how best to deal with a case in which there is a credible claim that jury deliberations were affected by the injection of an extraneous matter or influence but the issue of alleged extraneous influence on the jury came to light through a process that may have violated our *Fidler* principles.

.

procedure prescribed by *Fidler* itself, requiring the defendant to show by a preponderance of the evidence that the jury were exposed to an extraneous matter or influence, and then shifting the burden "to the Commonwealth to show beyond a reasonable doubt that [the defendant] was not prejudiced by the extraneous matter." *Commonwealth* v. *Kincaid*, 444 Mass. 381, 386 (2005), quoting *Fidler*, 377 Mass. at 201. At the hearing held on the Commonwealth's motion for reconsideration, the motion judge did allow the parties to present evidence on the issue of extraneous influence, including the testimony of the trial judge, court officers, and the defendant, but he did not permit the Commonwealth to cross-examine the defendant about his postverdict contacts with Constantine or any other steps the defendant may have taken to contact jurors. The motion judge also suggested to the Commonwealth that he would not permit Constantine to testify.[17]

In the circumstances here, this was error. The judge appeared to have credited Juror A's testimony that Constantine had made three telephone calls to Juror A over a period of several months. These contacts have a ring of overzealous persistence, if not harassment, and warranted further exploration — both as to their nature and as to the defendant's involvement in, or acquiescence to, Constantine's actions. It was important to investigate this issue, because Constantine's actions appeared to strike at the heart of a principal aim of the *Fidler* proscriptions: preventing harassment of jurors and potential interference with the integrity of the jury system.

Because the motion judge did not permit the Commonwealth a meaningful opportunity to inquire of Constantine or the defendant about the alleged *Fidler* violations, we remand the case to him for further proceedings.[18] After conducting further inquiry, the judge should conduct the balancing analysis described above

---

[17]The record is somewhat murky on this point. Constantine was on the Commonwealth's witness list for the November 20 hearing, but the Commonwealth did not call her as a witness. However, during the Commonwealth's attempted cross-examination of the defendant, the motion judge suggested in an exchange with the assistant district attorney that Constantine was irrelevant to the inquiry he was conducting because she was not at the court house on the day of the trial, and that the judge therefore would not permit her to testify.

[18]Contrary to the position of the Appeals Court, we believe that the case

in order to decide whether the defendant is entitled to a new trial.[19]

b. *Claim relating to proof of extraneous influence.* We address briefly a separate challenge that the Commonwealth has raised in its appeal from the judge's decision because it may have bearing on the proceedings on remand.[20] The Commonwealth argues that the judge's finding of extraneous influence was clearly erroneous as a factual matter. Findings are clearly erroneous only if the reviewing court has a "firm conviction that a mistake has been committed." *Commonwealth* v. *Kincaid,* 444 Mass. at 384, and cases cited. *Kendall* v. *Selvaggio,* 413 Mass. 619, 620-621 (1992), quoting *J.A. Sullivan Corp.* v. *Commonwealth,* 397 Mass. 789, 792 (1986). To the extent the Commonwealth asserts that the motion judge was somehow obliged to believe the trial judge and court officers over the jurors, "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court." *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980). The motion judge gave the trial judge's statements that he did not enter the jury room minimal weight, noting that "to a judge cases often blur over time especially if there is a delay from the time of a trial to the point where one is called upon to recollect the event." There is no basis in the record on which to reject this credibility determination. Notably, Juror A was the only juror contacted by Constantine, yet other jurors testified that the trial judge had

should be remanded to the same motion judge, not a different judge. The motion judge's decisions have not displayed bias; on the contrary, his opinions show careful, balanced fact finding and rational explanations for his conclusions. He is also familiar with this case, in which the original trial was held nearly six years ago, and is in the best position to ensure it moves toward resolution.

[19]As previously discussed, in the future, a judge should evaluate any credible evidence of a *Fidler* violation before allowing a defendant's motion to conduct a postverdict juror inquiry and embarking on the two-step inquiry that *Fidler* sets out. See *Fidler,* 377 Mass. at 201. In the present case, however, where the motion judge already has inquired of all the available jurors (as well as other witnesses), it is necessary to complete the analysis of the claimed *Fidler* violation in reverse order.

[20]We discuss this contention in order to respond to any claim by the Commonwealth that more evidence or argument is necessary on the issue whether an extraneous influence affected the jury in order for the motion judge to conduct the necessary balancing analysis.

entered the jury room. Three of the five testifying jurors (Jurors A, C, and D) testified that the trial judge was in the jury room during deliberations without counsel or the defendant present; a fourth juror (Juror E) remembered somehow receiving an answer to a question during the deliberations that was not in writing or given in the court room; and a fifth juror (Juror B), who stated that the trial judge did not enter the jury room, did not have a strong memory of the trial.[21]

The motion judge did not make specific findings as to what the trial judge said in the jury room, but he concluded, with ample support in the record, that the jurors were given the impression that they were required to reach a verdict and that deadlock was not an option. A trial judge's entering a jury room before the jury have returned a verdict and providing instructions off the record to jurors, without the presence of the defendant or counsel, may constitute an improper extraneous influence on a jury.[22] See *United States* v. *United States Gypsum Co.*, 438 U.S. 422, 459-462 (1978) (granting new trial in part because judge had ex parte conversation with jury foreman during deliberations and foreman likely received impression that judge wanted verdict "one way or the other"); *Sargent* v. *Roberts*, 1 Pick. 337, 341 (1823) (granting new trial because "no communication whatever ought to take place between the judge and the jury, after the cause has been committed to them by the charge of the judge, unless in open court, and, where practicable, in presence of the counsel in the cause"); *Commonwealth* v. *Patry*, 48 Mass. App. Ct. 470, 475 (2000) (granting new trial because judge gave supplemental instructions to jury in jury

---

[21]This juror did remember the trial judge telling the jurors before they entered the jury room, "Take as long as you need . . . . [I]f you don't reach a verdict, we'll come back tomorrow morning." The motion judge reviewed the trial transcript and found that these remarks were not made in the court room, permitting the inference that the judge made them to the jurors in the jury room.

[22]In addition to being potentially an extraneous influence, this conduct may violate the defendant's constitutional rights to a public trial and to have the assistance of counsel at all critical stages of the proceedings, including jury instructions. We note that the defendant raised these alternate grounds in his motion for a new trial, but they were not addressed separately by the motion judge, in light of his order granting a new trial on the ground of extraneous influence.

room, without presence of defendant, and stating, "[W]e think that judges should not enter jury rooms at any time to conduct the court's business, even with the parties' consent or at the invitation of the jury. Jury rooms are often small, cramped, and designed to hold a limited number of people. Because of the closeness, the proceedings can easily descend into a sense of informality and intimacy that may not be conducive to the proper administration of justice").

There is nothing in the record to indicate that the trial judge intended to influence the course of the jury's deliberations. Nevertheless, his mere presence in the jury room may have influenced the jury's decision-making. Although the instruction about continuing to deliberate until reaching a verdict may have been correct if given in the court room as part of the trial judge's charge prior to the start of the jury's deliberations, the potential for confusion was heightened because the instruction may have been given in response to a juror question about what to do if the jury could not reach a verdict, and because it was given within the confines of the jury room — subtly leading the jurors to infer that they must reach a verdict in order to leave the room.[23]

3. *Conclusion.* For the reasons stated, we vacate the order

---

[23]The Commonwealth does not challenge the motion judge's conclusion that the Commonwealth failed to prove the absence of prejudice, and we agree. If a trial judge does feel obliged to enter the jury room to speak to the jurors in a particular situation, the judge should ensure that a record is made of such communications with the jury. Because the trial judge's comments to the jury are not on the record, we have nothing to review in order to determine whether his statements were so innocuous that they reasonably could not have affected the verdict. The lack of record cannot be ascribed to the defendant; instead, the Commonwealth bears the risk of proving that whatever occurred was not prejudicial. Without a record of exactly what was said, we cannot conclude beyond a reasonable doubt that the Commonwealth has met its burden of showing that the judge's comments would not have affected the verdict of a hypothetical average jury. Cf. *Tarry* v. *State*, 289 Ark. 193, 197-198 (1986) ("the necessary inference from the incomplete record is that there was a second visit, during which the jury's questions were answered in some manner. Since the State has not met its burden of showing what occurred, the trial judge's violation of the statute [requiring supplemental instructions to be given in open court] must be deemed to have been prejudicial to the defendant").

Additionally, the motion judge found that the evidence against the defendant at trial was not overwhelming because there was no evidence that the

granting the defendant's motion for a new trial and remand the matter to the District Court for further proceedings consistent with this opinion before the motion judge.

*So ordered.*

defendant had been in an accident or failed a breathalyzer test, but there was evidence that he had medical issues that made it difficult for him to complete field sobriety tests. The Commonwealth does not challenge the judge's finding that this was a "triable" case, and therefore the judge's actions could have been prejudicial insofar as they may have encouraged the jury to convict.