NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12362

COMMONWEALTH  vs.  JOSE COLON.


Worcester.     October 2, 2018. - May 3, 2019.

Present (Sitting at Worcester):  Gants, C.J., Lenk, Gaziano,
Lowy, Budd, Cypher, & Kafker, JJ.


Homicide.  Jury and Jurors.  Interpreter.  Due Process of Law,
    Presence of defendant in courtroom, Fair trial.  Search and
    Seizure, Consent.  Evidence, Hearsay, Chain of custody.
    Practice, Criminal, Jury and jurors, Deliberation of jury,
    Examination of jurors, Voir dire, Interpreter, Presence of
    defendant, Public trial, Hearsay, Assistance of counsel,
    Capital case.



    Indictment found and returned in the Superior Court
Department on November 18, 2005.

    A pretrial motion to suppress evidence was heard by C.
Jeffrey Kinder, J., and the case was tried before Richard T.
Tucker, J.


    Elaine Pourinski for the defendant.
    Ellyn H. Lazar, Assistant District Attorney, for the
Commonwealth.


    LENK, J.  In the summer of 2005, the victim was beaten and

stabbed to death near a set of railroad tracks in Dudley.  In

2013, the defendant was convicted by a Superior Court jury of murder in the first degree for his role in the killing.  In this direct appeal, the defendant maintains that a new trial is required because the judge did not declare a mistrial after members of the jury were exposed to an extraneous influence, and that the judge committed reversible error by partially excluding the defendant from the subsequent voir dire of the deliberating jury.  In addition, the defendant argues that the judge should have allowed his request for individual voir dire on questions of ethnic bias, and abused his discretion in certain evidentiary rulings.  The defendant also asks us to exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or to reduce the degree of guilt.

We affirm the conviction and decline to exercise our extraordinary powers to grant relief under G. L. c. 278, § 33E.

1.  Facts.  We summarize the facts that the jury could have found, reserving additional details for discussion of specific issues.  See Commonwealth v. Clemente, 452 Mass. 295, 299 (2008).

Late on the evening of July 22, 2005, the victim and Jayser Cruz were socializing at the victim's family home; the victim and Cruz were family friends.  At some point during the evening, the victim's sister heard Cruz express an interest in a knife that was lying on a table.  The victim and Cruz then left the

house together.  According to the victim's sister, Cruz took the knife when they left.

Later that evening, the defendant was with Cruz and the victim at a convenience store.  They ran into two women, the defendant's cousin, Maria Colon,[1] and one of her friends.  Cruz and the victim were drunk.  The victim suggested that they all smoke marijuana, and the group walked to the nearby railroad tracks to do so.  Maria heard Cruz tell the defendant that Cruz recently had bought a new knife.

After approximately fifteen minutes, Maria and her friend left to go home.  As they were walking away, Maria heard what sounded like "skin ripping."  When she looked back, she saw the defendant throwing rocks at the victim; she described the rocks as thin and estimated them to be approximately one inch in width.  Her friend saw the defendant throw four to six rocks, which hit the victim in the back.  The victim fell to the ground, where he kept asking the defendant to "stop."  Cruz was laughing.  When the defendant requested a knife, Cruz handed him a backpack.  Maria asked the defendant to stop; he told her to leave, or "it would happen to [her] as well."  At that point, Maria and her friend left the area.  When they last saw him, the victim was on the ground in a fetal position.

---

[1] Because they share a last name, we refer to the defendant's cousin, Maria Colon, by her first name.

The next morning, when the defendant came to Maria's house, she saw "little dots" and "splatter-marks" on his left leg. That afternoon, she saw the defendant at a laundromat. When the defendant left the laundromat, the "little dots" on his pants were stained yellow, as though he had tried to wash them.

That evening, the defendant's girlfriend and her friend picked up the defendant and they all drove around. The defendant told his girlfriend that he had killed the victim, and he pointed toward something in the distance that "looked like feet." He said that he had killed the victim "for us," and he warned her not to tell anyone or he would harm her siblings.

Later that evening, the defendant telephoned Maria and told her that he had killed the victim. The defendant explained that he had left the railroad tracks and was walking home, but then he returned to the railroad tracks, where he saw the victim getting up. The defendant picked up a large rock and hit the victim in the head with it several times.

The same day, the victim's body was discovered near the railroad tracks. When a chemist from the State police crime laboratory arrived at the scene, he saw the victim lying on his back; his heavily-bruised face and clothing were covered with "red-brown staining." A large rock, weighing roughly fourteen pounds, with red-brown stains, was next to the victim. The stain later was determined to be the victim's blood. The

medical examiner concluded that the cause of death was a combination of blunt force trauma to the head and two stab wounds to the body. Deoxyribonucleic acid (DNA) testing indicated that the blood found on a pair of jeans recovered from the defendant's house was the victim's.

2. Prior proceedings. In November, 2005, a grand jury returned indictments, charging the defendant, among other things, with murder in the first degree. Thereafter, the defendant moved to suppress his statements to police and the items seized during the two searches of his house. Following an evidentiary hearing, a Superior Court judge, who was not the trial judge, allowed the motions to suppress in part and denied them in part. The judge found that the defendant's statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436, 479 (1966), because the Spanish interpretation of the Miranda warnings provided to the defendant were inadequate to apprise him of his rights. The judge denied the motion to suppress the evidence seized from the victim's house, after the judge determined that the defendant's consent to the first search had been validly obtained, and that police had had probable cause to obtain a warrant for the second search.

In March, 2013, the defendant was tried before a Superior Court jury. The jury convicted him of murder in the first

degree on theories of deliberate premeditation and extreme cruelty or atrocity. The defendant timely appealed.

3. Discussion. The defendant maintains that a new trial is required because the judge did not declare a mistrial when several deliberating jurors expressed concerns about their safety, and that the judge erred by partially excluding the defendant from the subsequent voir dire of the deliberating jury. The defendant argues also that he was denied a fair trial because the judge did not conduct individual voir dire of the members of the venire with respect to questions of ethnic bias that defense counsel had requested be posed. The defendant further asserts error in the denial of his motion to suppress physical evidence, as well as in the admission of out-of-court statements, and he contends that his attorney was ineffective in failing to make certain arguments at the hearing on the motion to suppress. In addition, the defendant asks us to exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or to reduce the degree of guilt.

a. Dismissal of jurors during deliberations. The defendant argues that he was denied the right to a fair and impartial jury when, after substantial evidence of bias was brought to the judge's attention during deliberations, the judge did not excuse the entire jury. Specifically, while the jury were deliberating, the juror in seat number 15 (juror no. 15)

notified a court officer that she was afraid of the repercussions of the potential verdict in the case. She feared that if the jury were to find the defendant guilty, there could be possible retribution by gangs; if they were to find him not guilty, someone else would be stabbed. Juror no. 15 was fearful, in part, because the defendant had heard her name. The other jurors "were all there" during juror no. 15's conversation with the court officer; juror no. 15 reported that other jurors also previously expressed similar fears. The judge found that juror no. 15 could not remain impartial and excused her.

Because juror no. 15 reported that others had expressed similar "gang-related" fears, the judge conducted an individual voir dire of each of the remaining members of the jury.[2] The juror in seat number 1 (juror no. 1) also was excused, after stating that he had been "watching to see if anyone is following me when I leave here." The foreperson, who was in seat number 3 (juror no. 3), reported that she had heard other jurors express fears about the proximity of the crime to "the location [in which] they lived" and "gang relation." Juror no. 3 also said she had been "concerned," the day before deliberations began, that people the defendant might know would "go after us." On

---

[2] Of the eleven remaining deliberating jurors, all but one had heard juror no. 15 express her concerns. The four alternate jurors, however, had not been present to hear her do so.

the first day of deliberations, however, juror no. 3 reported that she was no longer concerned.  The judge found that juror no. 3 "indicated very clearly that she didn't have any concerns now."  Over the defendant's objection, juror no. 3 was not excused.  The judge told juror no. 3 not to discuss the substance of the voir dire with anyone else.

Juror nos. 1 and 15 were replaced with alternates, and the jury were instructed to begin deliberations anew.  The defendant objected that the jury were not struck entirely; he argued that the "fear running through the deliberations" prevented the jury from remaining impartial.  The motion was denied.  Approximately one hour later, the jurors returned a verdict finding the defendant guilty.

On appeal, the defendant contends that the extraneous influences on the jury resulted in actual bias when the suggestion of gang activity was introduced during the process of deliberation, where no evidence of gang activity had been presented at trial.  The defendant argues that, as a result, he was denied the right to a fair and impartial jury when the judge declined to dismiss the entire jury.

i.  Extraneous influence.  "Article 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution guarantee a criminal defendant the right to a trial before an impartial jury."  Commonwealth v. Philbrook,

475 Mass. 20, 30 (2016). "The presence of even one partial juror violates this right." Commonwealth v. Guisti, 434 Mass. 245, 251 (2001), S.C., 449 Mass. 1018 (2007). "Prohibiting premature jury deliberations, and extraneous influences on jurors" is one of the ways in which to safeguard a defendant's right to trial before an impartial jury. Philbrook, supra.

Accordingly, extraneous influences on jurors present a "serious question of possible prejudice" (citation omitted). Guisti, 434 Mass. at 251. See Philbrook, 475 Mass. at 30. "An extraneous matter is one that involves information not part of the evidence at trial and raises a serious question of possible prejudice" (quotations and citation omitted). Guisti, supra. See, e.g., Commonwealth v. Cuffie, 414 Mass. 632, 635 (1993) (juror made unauthorized visit to crime scene); Commonwealth v. Fidler, 377 Mass. 192, 194 (1979) (during deliberations, juror stated information not presented at trial). A defendant bears the burden of demonstrating an extraneous influence by a preponderance of the evidence. See Commonwealth v. Kincaid, 444 Mass. 381, 386-387 (2005), discussing Fidler, 377 Mass. at 201.

In this case, the defendant was Hispanic and had "tattoos on [his] hands"; the victim was Caucasian. The case, as it was presented to the jury, did not involve allegations of gang involvement, and the record does not indicate that any evidence of gang affiliation was introduced at trial. The Commonwealth's

theory was that the defendant killed the victim in order to be with the defendant's girlfriend. Numerous jurors subsequently recalled juror no. 15's comments. The conversation regarding gang involvement included discussion of the location of the crime and the "tattoos on the [defendant's] hands."

Until jurors began discussing gang-related concerns, juror no. 3, for example, had not considered the defendant's tattoos to be meaningful; "I never noticed that. I didn't even think -- it never came into my . . . ." The introduction of the concept of gang affiliation by juror no. 15, therefore, constituted "information not part of the evidence at trial," and, as evidenced by the fear it caused some jurors, "raises a serious question of possible prejudice" (citation omitted). Guisti, 434 Mass. at 251.

Nonetheless, not all extraneous jury discussion compromises a defendant's right to a fair trial, and the presence of an extraneous influence does not necessarily require a mistrial. See Philbrook, 475 Mass. at 31. See also Commonwealth v. Amirault, 404 Mass. 221, 232 (1989). If a trial judge learns of such an influence, the judge must determine whether the jurors remain impartial and, if not, what remedy is required. See Philbrook, supra.

ii. Impartiality of remaining jurors. A trial judge has "discretion in addressing issues of extraneous influence on

jurors discovered during trial."  Commonwealth v. Trapp, 423 Mass. 356, 362, cert. denied, 519 U.S. 1045 (1996).  Because the "determination of a juror's impartiality is essentially one of credibility, and therefore largely one of demeanor, [a reviewing] court give[s] a trial judge's determination of impartiality great deference" (quotations omitted).  Philbrook, 475 Mass. at 30, quoting Commonwealth v. Alicea, 464 Mass. 837, 849 (2013).  A reviewing court "will not disturb a judge's findings of impartiality," or a judge's finding that a juror is unbiased, "absent a clear showing of an abuse of discretion or that the finding was clearly erroneous."  See Commonwealth v. Sleeper, 435 Mass. 581, 587 (2002); Commonwealth v. McCowen, 458 Mass. 461, 493-494 (2010).

Where a judge conducts individual voir dire of each juror, excuses all influenced jurors, and determines that the remaining jurors are impartial, a defendant's right to an impartial jury has not been violated.  See Philbrook, 475 Mass. at 31 (remaining jurors impartial after juror excused for deciding case prematurely); Commonwealth v. Maldonado, 429 Mass. 502, 506-507 (1999) (remaining jurors impartial after juror excused for fear of gang retribution); Commonwealth v. Kamara, 422 Mass. 614, 616-618 & n.1 (1996) (remaining jurors impartial after juror excused for telling other jurors defendant was member of gang).  See also Commonwealth v. Stanley, 363 Mass. 102, 104-105

(1973) (jurors impartial despite reading newspaper in deliberation room).

In Kamara, 422 Mass. at 616, one juror told the others that she knew the defendant, that the defendant was a member of a gang, and that she feared for her safety. The trial judge excused the juror and questioned each remaining juror. Id. at 617. The judge found that, although they had heard the extraneous information, the remaining jurors were able to be fair and impartial. Id. at 617-618. We concluded that such a determination was not an abuse of discretion. Id. at 620.

Here, juror no. 15 did not claim to know the defendant, or to know that he was a member of a gang. When she expressed fear of the defendant, the judge appropriately dismissed her, conducted an extensive voir dire of the remaining jurors, and dismissed an additional juror out of an "abundance of caution." Both counsel agreed to the dismissals of juror nos. 15 and 1. The other jurors stated individually that they had no similar concerns. The judge appropriately instructed the jury that they were to disregard "any personal likes or dislikes, opinions, [or] prejudices," and were not to base their verdict on "speculation, surmise[,] or conjecture."[3]

---

[3] Although these instructions were administered prior to deliberations, before juror nos. 1 and 15 were dismissed, there is nothing to suggest that the remaining jurors did not continue to heed them. See Commonwealth v. Stanley, 363 Mass. 102, 105

Having found that the remaining jurors were unafraid and could remain impartial, the judge was not obligated to dismiss them, and there was no abuse of discretion in his decision not to dismiss the entire jury. "We are not prepared to substitute our judgment for that of the trial judge who heard the evidence, carefully interviewed the jurors individually, and made a finding that each juror could do his or her job unaffected by whatever extraneous information had been injected into the jury room." Kamara, 422 Mass. at 620.

b. Lack of translators. The defendant's native language was Spanish. Throughout the trial, the defendant made use of two Spanish interpreters, who spoke to him through a headset. During the voir dire concerning the extraneous influence created by juror no. 15, the defendant was not provided with a translator. The defendant argues that he thereby was denied the right to a public trial.[4]

---

(1973) (court assumes instructions were followed). See also Commonwealth v. Maldonado, 429 Mass. 502, 506-507 813 (1999) (no error where judge dismissed one juror, questioned remaining jurors, and administered instructions regarding duty of impartiality). It would also have been prudent to instruct the newly constituted jury that the reasons for the juror's discharge had been personal and not related to the case. See Commonwealth v. Connor, 392 Mass. 838, 846 (1984) (jury should be instructed that reason for discharge is entirely personal). See also Commonwealth v. Dosanjos, 52 Mass. App. Ct. 531, 536 (2001).

[4] In his brief, the defendant refers to this issue as the right to a "public trial"; at oral argument, the defendant

After juror no. 15 had been dismissed, and before any of the other deliberating jurors had been interviewed by the judge, defense counsel requested that the defendant be present during the voir dire of the remaining jurors.  The judge, however, was concerned that the jurors would not speak candidly about their fear of the defendant if they knew he was listening.  Prior to the individual voir dire of the deliberating jurors, the following exchange occurred:

> Defense counsel:  "I think my client . . . [w]ell, I think he needs to be here."
>
> The judge:  "During the voir dire?"
>
> Defense counsel:  "You don't want him here during . . .?"
>
> The judge:  "Yes; he can be here during the voir dire.  I don't know that I want him to hear what's said, though."
>
> Defense counsel:  "No -- I have no problem with the court's direction that if anybody is excused, it's for personal reasons."
>
> The judge:  "I do not . . . want him to learn that one juror has left because she's fearful of him, because even if it's just a stare or something like that --"
>
> Defense counsel:  "I don't think he's exhibited any behavior.  He's basically just been sitting there looking

_____

claimed "a substantial right of the defendant to be present at crucial proceedings."  We understand the defendant to be arguing, if obliquely, that the lack of translators implicated the right to be present at trial under art. 12 of the Massachusetts Declaration of Rights.  The two rights are distinct, and we analyze them separately.  See Commonwealth v. Dyer, 460 Mass. 728, 734-738 (2011), cert. denied, 566 U.S. 1026 (2012).  We determine that, although the right to a public trial was not implicated here, the right to be present at trial was.

straight ahead . . . . It's a delicate balance, because I have to protect his rights, also."

The judge: "What would you suggest?"

Defense counsel: "Well, if he's at the sidebar, does he hear?"

The judge: "No; if he's sitting there with the headphones on, he'll get a translation of what is said."

Defense counsel: "Yes; but isn't he entitled to know? I mean, he has rights also as a defendant, to know if we're dealing with the jury who is going to decide his fate. We've got competing interests here."

. . .

The judge: "The concern I have is that first of all, it may be fearful to the jurors to speak candidly if it's being interpreted to him."

Defense counsel: "That's a consideration -- I understand."

The judge: "So, I think this has to be done outside of his hearing, and you can explain that some people -- whatever you explain -- had some concerns. Whatever you think you're duty-bound to tell him. I don't think you're duty-bound to tell him that people are fearful of him."

Defense counsel: "Oh, I agree with the court. I'm not duty-bound to tell him that; but my question is, any time anything of substance happens in a courtroom with a defendant, they have a right to be here. Now, I don't know how we get around that."

The judge: "I understand . . . . I'm going to order that he can't hear it. If you wish thereafter whatever you think you're duty-bound to reveal, you should do that."

Defense counsel: "So, your order is that we'll do the voir dire outside of the presence of the defendant?"

The judge: "No; he can be present, but not present with ears."

The judge effectuated the defendant's presence "without ears" by prohibiting interpreters at sidebar during the individual voir dire, such that the defendant could "watch" but would not understand what was being said. Defense counsel then could relay pertinent information to the defendant at a later point. Defense counsel agreed that, if a juror were excused, counsel would tell the defendant only that it was for "personal reasons," without explaining that any of the jurors had expressed fears of him. Neither defense counsel nor the defendant objected to this procedure, and voir dire commenced without translation.

i. Right to a public trial. The defendant argues for the first time on appeal that his right to a public trial, under the First and Sixth Amendments to the United States Constitution, was violated during the voir dire of the deliberating jurors. Even if this argument were not waived, it is unavailing.

That individual voir dire took place at sidebar was not itself error; "the voir dire examination process itself took place, as it should have, in open court." See Commonwealth v. Cohen, 456 Mass. 94, 117 (2010). See also Wilder v. United States, 806 F.3d 653, 660 (1st Cir. 2015), cert. denied, 136 S. Ct. 2031 (2016) (conducting voir dire at sidebar in open court still enables members of public to "observe the individual questioning of jurors from their seats and attempt to discern

facial expressions or body language").  "Conducting voir dire examinations in open court [also] permits members of the public to observe the judge, as well as the jurors."  Cohen, 456 Mass. at 117.  Although the public cannot hear what is being said, the ability to observe the process "furthers the values that the public trial right is designed to protect" (citation omitted).  See id.

ii.  Right to be present at trial.  Whether the defendant can hear what is being said, however, implicates a different right:  the right to be present at trial.  "When a judge conducts an inquiry about a consequential matter, such as an allegation of serious misconduct of a juror or a suggestion of juror bias, the defendant is entitled, based on confrontation and fair trial rights, to be present."  Commonwealth v. Dyer, 460 Mass. 728, 738 (2011), cert. denied, 566 U.S. 1026 (2012).  See Commonwealth v. Angiulo, 415 Mass. 502, 530 & n.26 (1993) (reversal required under art. 12 of Massachusetts Declaration of Rights where names of jurors were withheld and defendant and defense counsel were barred from voir dire regarding jurors' fear of defendant); Commonwealth v. Robichaud, 358 Mass. 300, 301-303 (1970) (reversal required under art. 12 where defendant was excluded from hearing on juror misconduct).

"While the trial judge may perform minor administrative formalities outside the presence of the defendant, . . . the

judge may not bar the defendant from a voir dire during which jurors' impartiality may be discussed" (citation omitted). Angiulo, 415 Mass. at 530. See, e.g., Commonwealth v. Dosanjos, 52 Mass. App. Ct. 531, 535 (2001) ("serious error" for judge to exclude defendant from individual questioning of deliberating jurors); Commonwealth v. Caldwell, 45 Mass. App. Ct. 42, 45 (1998) (error where deliberating juror was dismissed during colloquy held outside defendant's presence).

Counsel's presence at sidebar and intention to relay information to a defendant does not substitute for the defendant's presence. See Robichaud, 358 Mass. at 301, 303 (counsel's presence insufficient in defendant's absence); Dosanjos, 52 Mass. App. Ct. at 535 (error despite counsel's presence); Caldwell, 45 Mass. App. Ct. at 45 (error notwithstanding counsel's presence). This is especially so where, as here, counsel agrees to restrict the information that he would share with the defendant. Indeed, this does not appear to be a case in which a defendant was "fully informed of everything that occurred" in his absence. Contrast Commonwealth v. Martino, 412 Mass. 267, 286-287 (1992) (no reversible error where, after voir dire, defendant was fully informed of reason for juror's discharge and agreed to her dismissal). Rather, the judge cautioned defense counsel not to explain the very thing the jurors were discussing -- "that people are fearful of him" -

- and requested that the defendant learn nothing more than that several jurors had been dismissed for "personal reasons."

Where, without any action on his part, jurors fear a defendant, he does not forfeit his right to be present. See Angiulo, 415 Mass. at 520, 522 (right to be present at voir dire where jurors felt "intimidated" by defendant, believed he was writing down information about them, and saw him giving them "[the] whammy" or "[the] evil eye"). Contrast Commonwealth v. Senati, 3 Mass. App. Ct. 304, 307 (1975) (defendant forfeited right to be present by refusing to obey court order to refrain from leaving dock and shouting during trial). Nor may a judge seat a defendant far enough away that the defendant is unable to hear the proceedings, or conduct questioning, without interpretation, in a language the defendant does not understand.[5]

In denying the defendant's request, it appears that the judge applied an analysis more appropriate to the consideration of the right to a public trial. The judge stated that it would be sufficient for the defendant to "watch" without hearing, "[j]ust like we've said the open courtroom is satisfied if

---

[5] Of course, a defendant may waive the right to be present at sidebar. See Dyer, 460 Mass. at 738. "More particularly, if the defendant makes no request to be present, the judge takes no steps to exclude him, and counsel never objects to his absence, the issue is waived and this court will not address it on appeal." Id. There is no evidence on this record, however, that the defendant made such a waiver. See Commonwealth v. Caldwell, 45 Mass. App. Ct. 42, 46 (1998).

people can watch what's happening.  They don't have to sit at sidebar."  While it is true that the right to a public trial is satisfied without the public being present at sidebar, the same is not true for the defendant's right to be present at trial. The right to a public trial is premised on certain considerations, including the public perception of fairness in the courts; it is satisfied without hearing conversations at sidebar.  See Gannett Co. v. De Pasquale, 443 U.S. 368, 380 (1979).  A defendant's right to be present at his or her own trial, by contrast, implicates additional concerns.  It provides the accused with information necessary to adjust the trial strategy, guarantees that a defendant always has the opportunity to object, and, in the event of conviction, ensures that the defendant is able fully to assist in an appeal, because the defendant understood the prior proceedings.  For a defendant, as distinct from the public, the proceedings must not only be seen, but also heard.[6]

---

[6] This analysis applies whether a defendant is partially excluded due to an inability to understand English, or in any other manner.  We are particularly troubled, however, that the defendant's inability to understand English was used to exclude him from hearing the proceedings.  "A non-English speaker, throughout a legal proceeding, shall have a right to the assistance of a qualified interpreter."  G. L. c. 221C, § 2.  It is a judge's duty to aid, not hamper, a criminal defendant in understanding what is occurring at the defendant's own trial.

iii. Prejudice. Although the defendant's exclusion in this case was error, we must consider whether he thereby was prejudiced. "The absence of the defendant from [the voir dire of deliberating jurors] does not automatically constitute reversible error" (citation omitted). Sleeper, 435 Mass. at 588-589. Although defense counsel initially requested the defendant's presence at voir dire, counsel ultimately did not object to the judge's decision not to allow that request. Therefore, we review for a substantial likelihood of a miscarriage of justice. See Dyer, 460 Mass. at 741.

Had the defendant been present during voir dire, little would have changed. Of the twelve jurors questioned, two were dismissed after expressing fear related to the defendant. Defense counsel then moved to dismiss all of the remaining jurors. The judge denied that request, over counsel's objection. Because his attorney already had moved to dismiss each juror, there was nothing more that the defendant could have requested in terms of relief. Nor was the defendant in a position to make strategic decisions about cross-examination or introduction of evidence, informed by the content of the jurors' answers; the trial had concluded, deliberations had begun, and no additional evidence could have been presented.

"It is frequently to the defendant's advantage to communicate orally with his counsel . . . since he may have

information which may aid his counsel in examining [individuals]." Robichaud, 358 Mass. at 303. At most, if he had been present, the defendant could have suggested additional questions for counsel to ask the jurors. Yet, here, where the judge conducted an extensive voir dire of the deliberating jurors, the mere possibility that additional questions could have been asked is not sufficient to require a new trial. "The defendant's presence at the hearing would not likely have yielded anything or altered its outcome." Sleeper, 435 Mass. at 589 (harmless error where judge properly excused biased juror outside defendant's presence). See Dosanjos, 52 Mass. App. Ct. at 536 (harmless error to conduct voir dire in defendant's absence where defendant "offers no suggestion as to how he was prejudiced by the procedure" [citation omitted]). See also Commonwealth v. Hicks, 22 Mass. App. Ct. 139, 147 (1986). We are unable to conclude that the defendant's partial exclusion resulted in a substantial likelihood of a miscarriage of justice.

c. Individual voir dire of the venire on racial or ethnic bias. The defendant argues that the judge's decision not to conduct individual voir dire of prospective jurors' ethnic bias, in the form of five questions that defense counsel had requested be posed to each member of the venire individually, deprived him of his right to a fair and impartial jury, and requires a new

trial.[7]  Stating that the twenty-two question case-specific jury questionnaire[8] was sufficient to accomplish the goal of obtaining information on potential bias, the judge denied the request.[9]

---

[7] It is not clear whether the defendant raised this claim on constitutional or statutory grounds.  At least with regard to similar questions proposed for the written questionnaire, the defendant argued that the questioning was necessary to protect his rights under "the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights."

[8] Voir dire of prospective jurors took place in four stages.  First, each potential juror was given the "standard jury questionnaire."  Second, the judge orally posed questions to the venire as a group.  Third, each potential juror was given a twenty-two question written questionnaire, prepared specifically for this case.  Fourth, each potential juror -- regardless of whether the juror had answered any questions affirmatively -- came to the sidebar for additional questioning.

[9] One of the questions on the case-specific, twenty-two question juror questionnaire was the first of the five questions that defense counsel had requested be posed orally, specifically inquiring about the potential juror's beliefs as to a Hispanic defendant.  See note 11, infra.

The other four questions on potential bias toward a Hispanic defendant that were requested to be asked at voir dire were:

"2.  Do you believe that Hispanics are more likely to commit crimes than whites?

"3.  Would you believe the testimony of a white person over that of a Hispanic person simply because of skin color?

"4.  Would you give extra weight to the testimony of a white person claiming that a Hispanic person committed a crime?

"5.  Are you conscious of any feelings of racial bias or prejudice, which might tend to influence your judgement in this case, even in the slightest degree?"

The defendant is correct that, "in cases of interracial murder, a judge, if requested to do so, is required to conduct an individual voir dire on the issue of potential bias." Commonwealth v. Hunter, 427 Mass. 651, 654 (1998). See Commonwealth v. Young, 401 Mass. 390, 398 (1987), overruled on another ground, Commonwealth v. Ramirez, 407 Mass. 553 (1990) (establishing rule because of "reasonable possibility" that racial prejudice could affect jury's verdict in murder cases where defendant and victim are of different races). We similarly have required individual voir dire in cases of interracial rape, Commonwealth v. Sanders, 383 Mass. 637, 640-641 (1981), and interracial sexual offenses against children, Commonwealth v. Hobbs, 385 Mass. 863, 873 (1982). A written questionnaire does not suffice to fulfill this requirement. See Young, supra at 397-398, citing Rosales-Lopez v. United States, 451 U.S. 182, 190 (1981) and Sanders, supra. "As a matter of law we held that in such cases a substantial risk exists that the extraneous issue of race will affect the impartiality of the jury." Commonwealth v. Otsuki, 411 Mass. 218, 227 (1991).

As has the United States Supreme Court with the Federal cognate, we established this rule "as a matter of our supervisory power," based on the requirements of G. L. c. 234, § 28, the predecessor to G. L. c. 234A, § 67A, and not as a result of any constitutional mandate. See Young, 401 Mass. at

398.  As part of our duty to oversee the courts of the Commonwealth, we adopted "the essence of the rule, stated by the plurality, in Rosales-Lopez, [451 U.S. at 190], 'that questions directed to the discovery of racial prejudice be asked in certain circumstances in which such an inquiry is not constitutionally mandated.'"  Id., quoting Rosales-Lopez, supra.

Until today, we explicitly "have declined . . . to extend this rule to cases where the defendant and the victim are of different ethnic backgrounds."  Hunter, 427 Mass. at 654, citing Commonwealth v. De La Cruz, 405 Mass. 269, 272 (1989).  See Hunter, supra (no individual voir dire for Caucasian defendant and Filipino victim).  See also Commonwealth v. Pina, 430 Mass. 66, 72-73 (1999) (no individual voir dire for Cape Verdean defendant and Portuguese victim); De La Cruz, 405 Mass. at 272, 274 (no individual voir dire for Hispanic defendant and Caucasian victim).  Contrast Young, 401 Mass. at 391, 398 (individual voir dire for African-American defendant and Hispanic victim).  Rather, in murder cases involving individuals from different ethnic backgrounds, this court has left the determination whether individual voir dire on bias is warranted "to the sound discretion of the trial judge."  Hunter, supra.

Prior to trial, the defendant requested that the judge individually ask each prospective juror five questions related to racial or ethnic bias. Among them was the following:[10]

> "The defendant in this case . . . is a Hispanic male, and the victim in this case is a white male. Would those facts in any way interfere with your ability to render a fair and just verdict?"[11]

Although we have not mandated such questioning, where the defendant and the victim are of different ethnic backgrounds, we nonetheless have "encourage[d]" trial judges to conduct individual voir dire to detect prejudice based on ethnic considerations. See De La Cruz, 405 Mass. at 274. Yet the distinction between race and ethnicity, and, correspondingly, between that which we "require" and that which we "encourage," rests on an increasingly shaky foundation. Indeed, the Federal courts do not attempt to distinguish between race and ethnicity for purposes of juror voir dire. They operate under "a broader

---

[10] The defendant argued that it was necessary to ask this question in an individualized setting because "it's not until you start doing the individual voir dire that you get behind some of these questions, and people really come up and say to you, 'Well, I have this bias . . . Well, yeah; I did have this experience back in 19- whatever, and so I do have a bit of a prejudice against. . . .'"

[11] Question thirteen of the specifically-drafted juror questionnaire asks:

> "The defendant in this case is a Hispanic male. The victim is a white male. Would the fact that the defendant is Hispanic in any way interfere with your ability to render a fair and just verdict?"

rule" applying to "'ethnic,' as well as racial, groups."[12]  See

Young, 401 Mass. at 398 n.8.  See also Rosales-Lopez, 451 U.S.

_____

[12] "[I]n our heterogeneous society the [Federal] courts have found the boundaries of race and ethnicity increasingly difficult to determine," McCleskey v. Kemp, 481 U.S. 279, 316 n.39 (1987), and have noted the futility of attempting to define "ethnicity."  Rico v. Leftridge-Byrd, 340 F.3d 178, 183 (3d Cir. 2003) ("What, though, does 'ethnicity' and 'ethnic origin' mean . . . . And how does one define 'race' when the understanding of 'race' itself has changed over the centuries?").  See Rosales-Lopez v. United States, 451 U.S. 182, 194 (1981) (Rehnquist, J., concurring) ("knowing the contentiousness of our profession," it is unlikely that "precise definition of . . . 'different racial or ethnic groups' will ever be arrived at"); Suri v. Foxx, 69 F. Supp. 3d 467, 479 n.9 (D.N.J. 2014) ("Ethnicity does not have a clear definition in the law, and there is variation in how the terms 'race' and 'ethnicity' are used").

For purposes of discrimination under the Federal Equal Rights law, 42 U.S.C. § 1981, for example, Federal courts have defined "racial discrimination" as encompassing discrimination based on "ancestry or ethnic characteristics" (citation omitted).  Village of Freeport v. Barrella, 814 F.3d 594, 604-605 (2nd Cir. 2016).  For purposes of the Sixth Amendment right to a jury of one's peers, a defendant is entitled to a jury that fairly represents "distinctive groups" in the community.  United States v. Garcia, 991 F.2d 489, 491 (8th Cir. 1993).  See id., quoting United States v. Black Bear, 878 F.2d 213, 214 (4th Cir. 1989) ("A group of people is distinct when they have a shared attribute that defines or limits their membership, and when they share a community of interest").  In 2016, the United States Court of Appeals for the Second Circuit observed that the "confusion in unraveling the legal definitions of 'race' and "Hispanic'" has occurred since the distinction was first recognized by the United States Office of Management and Budget in 1977.  See Village of Freeport, supra at 602 & n.13.

In light of this, the United States Supreme Court has held, under its supervisory power, that a defendant charged with a "violent crime" who requests individual voir dire on the question of membership in "different racial or ethnic groups" is entitled to such questioning.  Rosales-Lopez, 451 U.S. at 192. Although ethnic distinction, and, for that matter, racial

at 192 ("[F]ederal trial courts must make [an individualized] inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups").

As the United States Supreme Court observed in 1981, when crafting its supervisory rule, "It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise such a possibility [that prejudice would influence the jury]." Rosales-Lopez, supra at 192. Although trial judges may be understandably hesitant to introduce notions of racial or ethnic bias into their court rooms, "[w]e think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred" (citation omitted). See Rosales-Lopez, supra at 191.

This court previously has declined to follow the Federal rule, and has done so using language that causes modern readers dismay, and in a manner that is neither prudent nor accurate. Thirty years ago, in De La Cruz, 405 Mass. at 273, we concluded

---

distinctions, may not be clear in every case, prior to voir dire, it is left to "the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued." See id. at 191.

that individual voir dire was not necessary where a Hispanic defendant was charged with sexually assaulting a Caucasian victim.  In doing so, we stated that our rule "implies that Hispanic persons are not members of the black (Negro) race," but, rather, could be viewed as "members of the white race," such that there was no racial difference between the Hispanic defendant and the Caucasian victim.  Id.  Ten years later, in Pina, 430 Mass. at 72-74, we determined that a Cape Verdean defendant charged with murdering a Portuguese victim similarly was not entitled to individual voir dire concerning prejudice.  To reach that conclusion, this court relied upon the proposition that "the term 'race' reflects the historical division of humanity by physical characteristics into three primary divisions:  Caucasian, Mongolian, & Negro."  Id. at 73 n.15, citing De La Cruz, supra at 272.  We have not addressed the issue since.

We recognize that the distinctions described in these cases retain little purchase in today's society.  Specifically, over the past few decades, the nation's landscape has changed dramatically with respect to its Hispanic population.  More than half of the country's population growth between 2000 and 2010 was attributable to an increase in the Hispanic population.[13]  In

---

[13] See Overview of Race and Hispanic Origin:  2010, U.S. Department of Commerce, Economics and Statistics Administration,

Massachusetts, an increase in the Hispanic population accounts for the entirety of the State's population growth in that same period.[14]  Indeed, the Commonwealth now relies on the category of "Hispanic," in addition to "African-American," "Caucasian," and "Asian," in determining such things as the probabilities of DNA matches.  See, e.g., Commonwealth v. Seino, 479 Mass. 463, 469 (2018); Commonwealth v. Diaz, 478 Mass. 481, 486 (2017); Commonwealth v. Broom, 474 Mass. 486, 488 & nn.3, 4, 5, 6 (2016).

The growing Hispanic and Latino population, in turn, has encountered varied sources of discrimination.  See, e.g., Commonwealth v. Buckley, 478 Mass. 861, 878 (2018) (Budd, J., concurring) (Hispanic drivers are stopped more often by police than Caucasian drivers); Bradley v. Lynn, 443 F. Supp. 2d 145, 148, 149 (D. Mass. 2006) (finding disparate and adverse impact on Hispanic candidates for entry-level fire fighter positions); Kane v. Winn, 319 F. Supp. 2d 162, 179 (D. Mass. 2004) (citing statistics that Latinos are overrepresented in country's prison

---

U.S. Census Bureau 3 (2011), https://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf [https://perma.cc/6QQH-Z227] (comparing 2000 census to 2010 census).

[14] See Passel, Cohn, & Lopez, Hispanics Account for More than Half of Nation's Growth in Past Decade, Overview, Pew Research Center (Mar. 24, 2011), http://www.pewhispanic.org/2011/03/24/hispanics-account-for-more-than-half-of-nations-growth-in-past-decade/ [https://perma.cc/8XL6-DVUA].

population, and "Latino youths are incarcerated at twice the rate of [Caucasian] American youths").

This type of discrimination poses no less a problem in the context of jury trials.  Indeed, research has shown that people of Hispanic and Latino descent -- not unlike African Americans -- are more likely to be treated severely by juries when accused of killing a Caucasian victim.  See, e.g., Race, Ethnicity, and Culture in Jury Decision Making, 11 Ann. Rev. L. & Soc. Sci. 269, 272-273 (2015) (jurors more likely to recommend capital punishment for African-American or Latino defendants accused of killing Caucasian victims).  Concurring in De La Cruz, 405 Mass. at 276, Chief Justice Liacos wrote that "[p]eople's prejudices do not . . . fit into categories formulated by Webster's Dictionary."  Rather, he observed that "[w]e have recognized previously, under the Declaration of Rights of the Constitution of the Commonwealth, the threat that bias toward ethnic groups presents to a fair trial."  Id. at 276 (Liacos, C.J., concurring).

"Nothing in the statute" on which we based our decision in Young, 401 Mass. at 398, "requires us to limit the voir dire requirement to racial prejudice" rather than to include ethnic

prejudice.  De La Cruz, 405 Mass. at 276 (Liacos, C.J.,
concurring).  Indeed, G. L. c. 234A, § 67A,[15] provides:

> "To determine whether a juror stands indifferent in the
> case . . . [with respect to] preconceived opinions toward
> the credibility of certain classes of persons . . . the
> court shall, or the parties or their attorneys may, with
> the permission and under the direction of the court,
> examine the juror specifically with respect to such
> considerations, attitudes, exposure, [and] opinions. . . ."

"The statute includes within its scope prejudices against
identifiable classes of individuals, including Hispanic
persons."  De La Cruz, 405 Mass. at 276 (Liacos, C.J.,
concurring).  See art. 1 of the Massachusetts Declaration of
Rights ("Equality under the law shall not be denied or abridged
because of . . . race . . . or national origin").  See, e.g.,
Commonwealth v. Long, 419 Mass. 798, 807 n.9 (1995) ("both
racial and ethnic groups are discrete groups protected under
art. 1"); Commonwealth v. Aponte, 391 Mass. 494, 503-504 (1984)
(addressing underrepresentation of Hispanic people on grand jury
venires).  There is no principled reason why a Hispanic
defendant charged with murdering a Caucasian victim should be
entitled to fewer protections against potential bias than an
African-American defendant in the same position.

---

[15] Our prior jurisprudence applied G. L. c. 234, § 28, as
amended by St. 1985, c. 463.  In 2016, that statute was replaced
with G. L. c. 234A, § 67A, inserted by St. 2016, c. 36, § 4.
The language as to this provision is virtually identical in both
statutes.

Of course, attorneys seeking to ask questions about ethnic bias would now have some leeway to do so during attorney-directed voir dire, which was not available to defense counsel at the time of the defendant's trial. See, G. L. c. 234A, § 67D, inserted by St. 2016, c. 36, § 4. Nonetheless, this questioning occurs within guidelines and limitations established by the judge, and does not provide a clear, consistent, authoritative, and reliable means of detecting bias among potential jurors in the way that mandatory questioning by the trial judge, upon request, would assure.

Indeed, the value of individual voir dire to uncover potential ethnic bias was evident in the empanelment proceedings in this case. A least one potential juror identified in her written questionnaire that the knowledge that the defendant was Hispanic would interfere with her ability to be fair and impartial. After the judge conducted voir dire concerning the juror's response, he found that she would not be able to be impartial and excused her. Another juror's ethnic bias, however, only came to the fore after answering individual voir dire questions, where the potential juror had marked "no" to the relevant question on the questionnaire.[16]

---

[16] Juror no. 10 acknowledged having formed an opinion about the case. Called to individual voir dire and asked to specify, the juror responded,

Of course, in many cases, ethnicity remains unlikely to be a source of bias in a murder trial, particularly where it is difficult for jurors to distinguish between the ethnicities of the defendant and the victim.  See generally Commonwealth v. Bastaldo, 472 Mass. 16, 28-30 (2015) (discussing difficulties of distinguishing ethnic differences in some circumstances).  In such cases, a reasonable defense attorney would likely have no reason to request individual voir dire on ethnic bias.  In light of the changes in our society since this court last addressed the issue, however, it is difficult to say now that the question of possible ethnic bias toward members of the Hispanic community can be set aside as not constituting "racial" bias; for instance, descriptions of suspects provided to police often now are stated as "light-skinned Hispanic male," Commonwealth v. Nelson, 468 Mass. 1, 5 (2014), or "dark-skinned Hispanic or

---

Juror no. 10:  "What is on his head?  What's that thing on his head?"

The judge:  "It's an earphone."

Juror no. 10:  "Does he not understand English?"

The judge:  "Right.  His native language is Spanish."

Juror no. 10:  "Yeah -- that's . . . he's an American citizen, and he can't understand and speak English, so that's why I've formed an opinion."

The juror was excused.

light-skinned African-American," Commonwealth v. Cavitt, 460
Mass. 617, 619 (2011).

Therefore, as a matter of our supervisory power, in cases
of murder, sexual offenses against children, and rape, decided
after the issuance of the rescript in this case, we extend the
principle announced in Young, 401 Mass. at 398; Hobbs, 385 Mass.
at 873; and Sanders, 383 Mass. at 640, and require that, where a
defendant facing trial on such a charge requests individual voir
dire on the issue of racial or ethnic prejudice, and the
defendant and the victim are of different such backgrounds, that
request should be granted.[17]

"In prior cases announcing new rules or requirements in the
exercise of our superintendence power, we have declined to give
the new rule or requirement retroactive effect." Commonwealth
v. Dagley, 442 Mass. 713, 720-721 (2004), cert. denied, 544 U.S.
930 (2005). See Commonwealth v. Ramos, 31 Mass. App. Ct. 362,
366 (1991) ("all previous extensions of the Sanders rule have

---

[17] We do not at this time expand the categories of crimes
which, as a matter of law, require individual voir dire with
respect to racial or ethnic bias. See, e.g., Commonwealth v.
Grice, 410 Mass. 586, 589 (1991) (declining to expand rule to
include armed robbery). Where other crimes are at issue, the
decision to conduct individual voir dire remains within the
sound discretion of the trial judge. Nothing in this decision,
however, should be read to discourage judges from conducting
individual voir dire on racial or ethnic bias, regardless of the
crime charged. Nor do we mean to suggest that individual voir
dire on the question of racial or ethnic bias should not be
conducted at sidebar. See Dyer, 460 Mass. at 738.

been prospectively applied"). Accordingly, the rule we announce today shall be applied in cases tried after the issuance of the rescript in this case, and not to the defendant's case. See, e.g., Commonwealth v. King, 445 Mass. 217, 248 (2005), cert. denied, 546 U.S. 1216 (2006) (prospectively applying new first complaint doctrine).

Under our jurisprudence at the time the defendant's case was tried, in the absence of a "substantial risk" of ethnic bias, the choice to conduct individual voir dire on the question of ethnic bias was left to the discretion of the trial judge. See Hunter, 427 Mass. at 654. The Commonwealth did not argue that the defendant's ethnicity was "a possible motive for the killing, or otherwise informed the evidence." See Pina, 430 Mass. at 74. The defendant was identified by witnesses who knew him; he was not made a suspect on the basis of his ethnic characteristics. See id. Accordingly, we are confident that the judge correctly determined that there was no substantial risk of bias related to ethnicity. Thus, it was within the judge's discretion to deny the request for individual voir dire.

d. Consent to search. As stated, prior to trial, the defendant moved to suppress statements and evidence recovered during a police search of his residence. The motion judge allowed the motion to suppress the statements, after he found that the Miranda warnings were inadequate, but denied the motion

to suppress evidence. He concluded that some of the evidence had been seized pursuant to a "consent search" and some of the evidence was seized during a second search, with a warrant; the warrant affidavit did not rely on or even mention any of the evidence seized during the warrantless search.

On the day after the victim's body was discovered, police brought the defendant to the police station for questioning. At that time, the defendant was twenty-one years old; he could not read English, and he had a limited understanding of spoken English. Accordingly, a police officer was brought in to translate from English to Spanish. The officer read from a Miranda rights card, written in English, which he attempted to translate into Spanish. The officer advised the defendant of his Miranda rights as follows:

> "These are your Miranda rights. Before we begin I have to read this to you, ok? They're in English, I'm going to read it for you in Spanish, but back here where you sign it's going to be in English. You understand? Ok. Before they, we ask you any question, you can stay quiet. You have right to silence. Uh, every little thing that you say we can use it in court. You have a right to talk to a lawyer before we ask you something. If you cannot pay for a lawyer the court gives you a lawyer without paying anything. If you want to talk to us without a lawyer here, you can stop when you want, without a lawyer. So if you want to talk to us and you want to stop, well that is your right, you want to talk and say nothing, to be looking for a lawyer. You understand? Ok."

Following this interpretation of his Miranda rights, the defendant agreed to speak with the officers.  He denied any involvement in the victim's death.

Later in the interview, police requested the defendant's consent to search his residence.  They presented him with a consent to search form, printed in English, which the officer again attempted to explain in Spanish.  The officer did not provide a verbatim oral recitation of the language on the form, but he did tell the defendant that if he did not want to sign the form, "you don't sign it."  The defendant ultimately signed the form.

Police searched the house where the defendant had been staying.  They seized various items of clothing from an area of the living room where he had been sleeping and keeping his belongings.[18]  Officers then obtained a search warrant, returned to the residence, and seized additional items.  A pair of blue jeans with a yellow stain on the ankle was located under the couch in the living room.  Due to an error in the evidence log, it is unclear whether the jeans were seized during the first search or the second search.

---

[18] The defendant had come to Massachusetts from Puerto Rico approximately one month earlier and had been staying at his uncle's house.

On appeal, the defendant argues that the judge erred in denying the motion to suppress the evidence seized, because the Commonwealth did not show that the defendant freely and voluntarily consented to the search, and the evidence seized pursuant to the later warrant should have been suppressed as the fruit of the poisonous tree. The motion judge found that the defendant's affidavit was limited, however, to the contention that, had he "understood [his] rights under Miranda, [he] would not have signed the consent form." The defendant's appellate counsel concedes that the defendant "did not raise" any other issues regarding the consent form in Superior Court.

"The theory on which a motion to suppress is presented in the trial court cannot be changed when the motion comes before this court for review." Commonwealth v. Pina, 406 Mass. 540, 542, cert. denied, 498 U.S. 832 (1990). As the motion judge noted, quoting Commonwealth v. Costa, 65 Mass. App. Ct. 227, 231-232 (2005), "[a] Miranda-like warning is not a necessary prerequisite to a valid consent [to search] under the Fourth Amendment [to the United States Constitution] or under art. 14 [of the Massachusetts Declaration of Rights]."

Even if the question of voluntariness were to be considered, there was no error. The Commonwealth bears the burden of proving that consent was freely and voluntarily given. See Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995).

Consent is free and voluntary where it is "unfettered by coercion, express or implied," and must be more than mere "acquiescence to a claim of lawful authority" (citations omitted). Id. The failure to inform a defendant of the right to withhold consent is a relevant consideration, but not necessarily dispositive. See Commonwealth v. Carr, 458 Mass. 295, 302 (2010). A voluntariness determination requires a consideration of the totality of the circumstances. Commonwealth v. Rogers, 444 Mass. 234, 242 (2005).

While the motion judge found that the officer who presented the defendant the consent form was unable to give "a verbatim recitation of the language [on that form],"[19] the judge found further that the translation was sufficient to permit free and voluntary consent. He observed that consent to search need only be "free and voluntary," not "knowing and intelligent"; that the defendant was informed of his "right to refuse consent"; and that there was no trickery or coercion in the police conduct.

The motion judge's determination is supported by the record. Although some warnings contained on the printed English form were not conveyed, the translation of the form included the key information that the police were asking to search the

_____

[19] At the hearing on the motion to suppress, the officer testified that he was unable "to read that [form] verbatim to [the defendant]" in Spanish, in part because some of the words "exceed[ed his] comfort level."

defendant's residence and that, by signing the form, the defendant was giving them permission to do so.  There was no evidence that the defendant's will was overborne.  The judge's finding that the defendant's consent was free and voluntary thus was not clearly erroneous.[20]

e.  <u>Admission of out-of-court statements</u>.  The defendant claims that the judge erred in allowing a police investigator to testify to double hearsay evidence in two instances.  Because the defendant objected at trial, we review to determine whether the introduction of the testimony was error and, if so, whether it was prejudicial.  See <u>Commonwealth</u> v. <u>Sullivan</u>, 478 Mass. 369, 375-376 (2017).  "An error is not prejudicial if it 'did not influence the jury, or had but very slight effect'"

---

[20] The officer's inability to convey a precise and complete translation nonetheless is concerning.  Although the incomplete translation proved sufficient in this instance, the additional warnings included on the English version of the form -- which the officer did not translate -- doubtless have some value.  That non-English speaking defendants should receive fewer warnings in their interactions with the police runs counter to our long-standing principles of equal treatment and access to justice.  See generally <u>Bridgeman</u> v. <u>District Attorney for the Suffolk Dist</u>., 476 Mass. 298, 311-312 (2017) (noting defect in Commonwealth's Spanish translation of notice to criminal defendants); <u>Commonwealth</u> v. <u>Siny Van Tran</u>, 460 Mass. 535, 561 (2011) (waiver of right against self-incrimination invalid where Chinese translation "fell measurably below what would be required to impart the substantive meaning of the right").

This could be avoided if care were taken to provide proper translation.  Indeed, as the translating officer indicated, "If [the form] was given to me in Spanish, I could have gone through it with him in Spanish."

(citations omitted).  Commonwealth v. Cruz, 445 Mass. 589, 591
(2005).

At trial, the defendant employed a Bowden defense, see
Commonwealth v. Bowden, 379 Mass. 472, 486 (1980); he argued
that Cruz had killed the victim, and that the police had failed
properly to investigate Cruz's actions.  A Bowden claim refers
to defendants' "right to base their defense on the failure of
police adequately to investigate [the crime] in order to raise
the issue of reasonable doubt as to the defendant's guilt in the
minds of the jury" (citation omitted).  See Commonwealth v.
Avila, 454 Mass. 744, 753 (2009).  We discern no error in
permitting the testifying officer to rebut the defendant's
Bowden defense by testifying to out-of-court statements that
affected the conduct of the police during the course of the
investigation.

Through a State trooper, the defendant presented evidence
that, according to an internal police report, "[A]fter an
exhaustive investigation, investigators were able to determine
that Cruz was responsible for the death of [the victim]."  On
cross-examination, the prosecutor asked the trooper about
statements made to him during interviews he had conducted with
several witnesses.  In one statement, the defendant told his
cousin Maria that he had "smashed" the victim in the head with a
big rock and stabbed him five times.  Maria thereafter repeated

the defendant's words to one of her friends.  The friend ultimately repeated the statements to the officer.  In a second statement, the defendant told his girlfriend that he had killed someone, and pointed out the location of the body.  His girlfriend repeated the defendant's statement to one of her friends, who, in turn, relayed the statements to the investigator.

The defendant objected to the admission of these statements on grounds of hearsay, double hearsay, and prejudice.  Noting that, in the context of a Bowden defense, the statements are admissible for a purpose other than their truthfulness, the judge overruled the objections.  The judge gave detailed limiting instructions immediately before and immediately after the officer presented this testimony, and explained to the jury that the statements were not being offered for their truth but, rather, to show that the police had been presented with the information at the time they were deciding which suspects to investigate.

If a defendant raises a Bowden defense, our "cases make clear that . . . the Commonwealth has the right to rebut it." Avila, 454 Mass. at 753.  A Bowden defense, therefore, is "a two-edged sword for the defendant, because it opens the door for the Commonwealth to offer evidence explaining why the police did

not follow the line of investigation suggested by the defense." Commonwealth v. Silva-Santiago, 453 Mass. 782, 803 n.25 (2009).

"[T]he presentation of a Bowden defense can expand the usual evidentiary boundaries quite significantly," and can permit introduction of evidence that "otherwise [would not] be admitted on hearsay or relevance grounds." Avila, 454 Mass. at 757. The permissible scope of rebuttal evidence depends, in part, on the issues raised by the defense; "the more wide-ranging the defendant's attack on the police investigation, the broader the Commonwealth's response may be." Id. at 754-755.

Prior to trial, trial counsel argued that out-of-court statements of Cruz that "border[ed] on an admission" should be admitted in light of the Bowden defense. The statements were then introduced at trial. By the same token, the fact that the police had been informed of competing admissions, which instead implicated the defendant, permissibly could be introduced as rebuttal, to help the jury understand why the police focused on the defendant rather than on Cruz. "[T]he Commonwealth was entitled to elicit testimony about why the investigators chose the particular investigative path they did, including the reasons they ultimately accepted and acted on . . . information that the defendant was the person who [killed] the victim." Avila, 454 Mass. at 755.

Nor do we think that the judge abused his discretion in determining that the probative value of the testimony was not substantially outweighed by its prejudicial effect.  See Commonwealth v. Sylvia, 456 Mass. 182, 192 (2010) (balancing probative value and prejudicial effect "are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error" [citation omitted]).  The quantity of statements to which the officer testified was not excessive.  Contrast Commonwealth v. Lodge, 431 Mass 461, 467 (2000) ("a general expression of the officer's opinion of guilt, followed by a recital of all the evidence against the defendant, is not permitted").  Moreover, the jury already had heard much of the substance of the testimony through Maria and the defendant's girlfriend, who had described the defendant's statements in detail.[21]

f.  Ineffective assistance of counsel.  The defendant contends that his trial counsel was ineffective for failing to move to suppress the jeans seized from the defendant's residence on the ground of improper documentation in the chain of custody.  Police testified that the jeans were recovered during a search

---

[21] The defendant argues also that it was error to permit the trooper to opine as to the defendant's guilt.  Had the trooper done so, there might have been error.  The trooper testified, however, that the evidence led his investigation "to focus on [the defendant]," as opposed to other suspects.

of the defendant's residence, and were placed in a bag labeled "22." The evidence log, however, contained only twenty-one entries, and did not reflect that jeans had been found and bagged at the scene. The log indicated that other items of clothing were seized both during the consent search and, later, during the search pursuant to the warrant.

When evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we apply the standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice. Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014). In doing so, we determine whether there was an error in the course of trial, and, if so, whether it was likely to have influenced the jury's conclusion. Id. Where the basis of the claim is counsel's failure to file a motion to suppress, "the defendant has to demonstrate a likelihood that the motion to suppress would have been successful." See Commonwealth v. Comita, 441 Mass. 86, 91 (2004).

In this case, counsel moved, unsuccessfully, to suppress the jeans on other grounds. Moving to suppress the jeans on the additional basis that they were improperly labeled was unlikely to have succeeded. "Defects in the chain of custody of otherwise admissible evidence go to the weight of the evidence, as opposed to the admissibility of the evidence." Commonwealth

v. Miller, 475 Mass. 212, 228 (2016).  See Commonwealth v. Jones, 42 Mass. App. Ct. 378, 380-381 (1997) (counsel not ineffective despite failing to object notwithstanding weakness in chain of custody).

g.  Relief pursuant to G. L. c. 278, § 33E.  Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the entire record carefully, and discern no reason to use our extraordinary power to reduce the verdict or to order a new trial.

Judgment affirmed.